[Nos. B150872, B152814. Second Dist., Div. Three. Apr. 4, 2002.]

In re ANGEL B., a Person Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND
FAMILY SERVICES, Plaintiff and Respondent, v.
TEIA Z., Defendant and Appellant.

COUNSEL

Steven D. Schatz, under appointment by the Court of Appeal, for Defendant and Appellant.

Lloyd W. Pellman, County Counsel, and Angela Williams, Deputy County Counsel, for Plaintiff and Respondent.

OPINION

**CROSKEY, Acting P. J.**—Teia Z. (Mother) appeals from two orders of the juvenile court. One order, entered nunc pro tunc on May 30, 2001 (the nunc pro tunc order itself was made on July 31, 2001) denied her Welfare and Institutions Code section 388 petition,[1] and on August 8, 2001, the juvenile court terminated Mother's parental rights to Angel B. (Angel). Mother appealed from both orders, and those appeals were consolidated on October 4, 2001, for resolution here.

---

[1]All further statutory references are to the Welfare and Institutions Code, except as otherwise noted.

FACTUAL AND PROCEDURAL BACKGROUND[2]

Mother gave birth to Angel in June 2000; thus, Angel will be two years old in June 2002. Angel was born exposed to cocaine and amphetamines, and Mother admitted using drugs shortly before Angel's birth, which she acknowledged was a bad thing to have done. Angel never lived with Mother, but was detained while in the hospital, and then promptly placed in foster care with a potential adoptive family.

Two years earlier, in November 1998, Mother had given birth to Robert, who was also born exposed to amphetamines and methamphetamines. Robert had been declared a dependent of the juvenile court, and Mother had failed to reunify with him. Many years earlier, Mother had also lost custody of this first child. As to Robert, he had been placed with a foster family that wanted to adopt him, and Angel, too, was placed with this same family with the plan that she would be adopted along with Robert. In addition to Robert and Angel, the foster family had two biological children and a sibling set of children who the foster family had already adopted.

Mother had a long history of drug abuse, having begun using at the age of 13. By 2000, she was 35 years old, and had tried to rehabilitate herself, without permanent success, on a number of occasions.

Mother was granted monitored visitation with Angel. She appeared for only some of the scheduled visits. She also failed to appear at several of the earliest court hearings. The juvenile court ordered that Mother not receive any reunification services pursuant to section 361.5, subdivision (b)(10), because Robert had been ordered into permanent planning rather than re-united with Mother.

Despite these problems, Mother did begin to do better. She enrolled in a residential drug treatment program, consistently tested clean for four months, completed various classes, and even obtained employment. She had regular visits with Angel, which went well. As a result, she petitioned the juvenile court pursuant to section 388 to either grant her supervised custody of Angel, or grant her reunification services. Her petition was summarily denied without an evidentiary hearing, and thereafter her parental rights were terminated. She appeals from both orders.

CONTENTIONS ON APPEAL

Mother contends that the juvenile court (1) violated her constitutional right to due process by refusing to hold a hearing on her section 388 petition;

---

[2]We recite only those background facts particularly needed for an understanding of the issues raised by this appeal, and do not go into detail as to the various procedural matters that accompany most dependency cases.

(2) erred by failing to grant her either supervised custody of Angel or reunification services; and (3) erred by finding that her relationship with Angel did not meet the requirements of the exception to termination of parental rights in section 366.26, subdivision (c)(1)(A). The Los Angeles County Department of Children and Family Services (DCFS) disputes these contentions.

## DISCUSSION

### 1. *The Juvenile Court Did Not Violate Mother's Constitutional Rights by Refusing to Grant Her a Hearing on Her Section 388 Petition, Nor Did It Err by Refusing to Grant Her Either Supervised Custody or Reunification Services*

█ Mother first contends that the juvenile court violated her constitutional rights by denying her request for a hearing on her section 388 petition, and further contends that, in fact, the juvenile court should have granted her either supervised custody or reunification services. In fact, the juvenile court not only denied her an evidentiary hearing, but also summarily denied the petition.[3] █ We review such a summary denial for abuse of discretion (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250 [104 Cal.Rptr.2d 422]), and resolve the constitutional issue as a matter of law.

Section 388 provides, in relevant part, "(a) Any parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court . . . for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court. The petition shall . . . set forth in concise language any change of circumstance or new evidence which are alleged to require the change of order or termination of jurisdiction. [¶] . . . [¶] (c) If it appears that the best interests of the child *may* be promoted by the proposed change of order, . . . , the court *shall* order that a hearing be held and shall give prior notice, . . . " (Italics added.)

---

[3]The petition itself is marked "denied." The reporter's transcript contains comments implying that the juvenile court might have thought that the pending section 366.26 contested permanency plan hearing would take the place of the section 388 hearing. However, a contested section 366.26 hearing does not take the place of a hearing on a section 388 petition, and the erroneous denial without hearing of such a section 388 petition is not necessarily harmless, even though oral testimony is taken at another hearing. (See, e.g., *In re Hashem H.* (1996) 45 Cal.App.4th 1791, 1800-1801 [53 Cal.Rptr.2d 294] [during reunification period, denial of section 388 petition was not harmless, even though trial court heard testimony of mother's therapist at contested hearing on permanent placement of child; at permanent plan hearing, juvenile court no longer considered reunification with mother as an option, focusing instead on providing permanent home for child].)

■ A petition under this section must be liberally construed in favor of its sufficiency. (Cal. Rules of Court, rule 1432(a).) Thus, if the petition presents *any* evidence that a hearing would promote the best interests of the child, the court must order the hearing. (*In re Aljamie D.* (2000) 84 Cal.App.4th 424, 431-432 [100 Cal.Rptr.2d 811].) The court may deny the application ex parte only if the petition fails to state a change of circumstance or new evidence that even *might* require a change of order or termination of jurisdiction. (Cal. Rules of Court, rule 1432(b); *In re Aljamie D., supra,* 84 Cal.App.4th at pp. 431-432.)

As Mother herself concedes, this statutory scheme itself is constitutional because of its many safeguards. One such safeguard, as she acknowledges, is that if a parent makes a prima facie showing of a change of circumstance such that a proposed change in custody *might* be in the child's best interest, then the juvenile court *must* hold a hearing. ■ Thus, the real issue here is not whether this statutory scheme is constitutional, but whether Mother made the requisite prima facie showing; if she did, then we shall simply reverse and direct the juvenile court to hold the hearing due process does require.

Whether Mother made a prima facie showing entitling her to a hearing depends on the facts alleged in her petition, as well as the facts established as without dispute by the court's own file (e.g., Angel's age, the nature of her existing placement, and the time she came into care as a dependent child). The facts alleged in Mother's petition are set out in a declaration from Mother, a letter from Mother, a letter from Bonnie Brown (a family friend whose relationship with Mother was that of a second mother), and a letter from CriHelp (the residential drug rehabilitation program in which Mother was enrolled).

According to Mother, she had enrolled in CriHelp in late January 2001, and would graduate in July 2001. She had obtained employment and would be working 35 hours per week, had consistently tested clean for drugs and alcohol while in the program, and had completed parenting, anger management and daily living skills classes. In addition, she was successfully participating in individual counseling, had visited with Angel consistently (missing only those visits that the social worker or foster parents were unable to attend), and she and Angel had bonded (Mother noted that Angel reached for her and was obviously happy to see her at visits). Mother also specifically asked, if she could not be given supervised custody, that she be given reunification services.

The CriHelp letter noted that between January 24, 2001, when Mother entered the CriHelp program, and May 29, 2001, the date on which the

CriHelp letter was prepared, Mother had made "outstanding progress." The letter confirmed Mother's statements about her classes and negative drug and alcohol tests.

Bonnie Brown explained the nature of her relationship with Mother (that of a second mother) as well as the length of time she had known Mother (since Mother was a little girl). She set out the nature of Mother's family of origin, which included such problems as an alcoholic father who didn't work much and a mother who worked long hours to support the family, and the lack of any parental involvement in such positive activities as homework and visits to the library. In contrast, Brown also commented on the family of origin's less wholesome activities, for example, that Mother's father had allowed Mother to smoke marijuana with him when she was only nine years old, that her father physically abused all the children, that the mother did not protect them, and that when the mother died the father essentially deserted the children.

Brown, who had acted as the monitor for Mother's visits with Angel, noted the change she had seen in Mother: her eyes had become clear, she smiled and laughed and could talk about the past, and she obviously loved Angel and was "alive in her presence." Brown opined that Angel's birth had motivated Mother to change, and that this time, Mother was actually *ready* to change. Brown confirmed that Mother had a job, and also opined that Angel's place was with Mother.

Given this evidence, did the juvenile court abuse its discretion by refusing to hold a hearing on Mother's section 388 petition? We conclude that it did not. A review of the kinds of cases in which courts have reversed summary denials of section 388 petitions is instructive.

In *In re Jeremy W.* (1992) 3 Cal.App.4th 1407 [5 Cal.Rptr.2d 148], the section 388 petition was accompanied by three declarations, in one of which the mother's doctor opined that she was *presently able to provide suitable care for her son. (Jeremy W.,* at p. 1416.) Likewise, in *In re Hashem H., supra,* 45 Cal.App.4th 1791, the petition included a letter from a physician discussing the substance of the mother's therapy, opining that she *now could adequately supervise her son full-time,* and recommending he be returned to her custody. (*Id.* at p. 1798.) And in *In re Aljamie D., supra,* 84 Cal.App.4th 424, the petition alleged several concrete changes in the mother's situation, such as completion of a variety of educational programs, including domestic violence management, as well as consistent visitation and strong bonding with the children. (*Id.* at p. 432.) Moreover, the petition also showed that *the 9 and 1 year-old children's first choice, repeatedly expressed, was to live with*

*their mother. (Ibid.)* This later fact is clearly important and relevant to the outcome in *In re Aljamie D.*; other cases have held that simple completion of the kinds of classes taken by the mother in *In re Aljamie D.* and by Mother here does not, in and of itself, show prima facie that either the requested modification or a hearing would be in the minor's best interests. (See § 388; Cal. Rules of Court, rule 1432(c); *In re Jasmon O.* (1994) 8 Cal.4th 398, 415 [33 Cal.Rptr.2d 85, 878 P.2d 1297]; *In re Anthony W.* (2001) 87 Cal.App.4th 246, 250 [104 Cal.Rptr.2d 422].)

Here, there was no evidence that Mother was ready to assume custody of Angel or provide suitable care for her; while she had completed the drug program, the time she had been sober was very brief compared to her many years of drug addiction (a concern expressed by the social worker), and in the past she had been unable to remain sober even when the stakes involved were the loss of her other child. Nor was there evidence that she had a housing situation suitable for Angel, or any arrangements for child care while she worked. And, unlike the situation in *In re Aljamie D.*, there was no evidence that Angel preferred to live with Mother rather than with the foster family.

It is also instructive to consider cases in which a section 388 petition was summarily denied and the denial was then affirmed. In *In re Jamika W.* (1997) 54 Cal.App.4th 1446 [63 Cal.Rptr.2d 513], the mother's section 388 petition alleged that she was participating in a drug recovery program and was testing clean, was receiving help for her developmental delays, and had missed previous court hearings only because of transportation problems. *(Id.* at pp. 1449-1450.) The reviewing court noted that these facts were part of the ongoing record in the case with which the juvenile court was thoroughly familiar, not evidence of changed circumstances or new evidence. *(Id.* at p. 1451.) In addition, the record showed that the mother had had very little contact with her child, had failed to follow the plan for reunification services, the existing guardian was capably caring for the child's needs, the child was bonded to the guardian, and the child was doing quite well. *(Ibid.)* In other words, the mother's petition failed to state facts that showed that the child's best interests *might* be promoted by the proposed change of order.

Here, too, whether Angel's best interests might be promoted by Mother's proposed change of order is a crucial issue in any determination of whether Mother's section 388 petition should have been granted. █ The "best interests of the child" standard (§ 388, subd. (c)) is sufficiently clear to allow a review of the denial of a section 388 petition. Although the specific factors a court must consider vary with each case, each child's best interests would necessarily involve eliminating the specific factors that required placement

outside the parent's home (*In re Heather P.* (1989) 209 Cal.App.3d 886, 892 [257 Cal.Rptr. 545]), here, Mother's drug addiction.

In addition, as in any custody determination, a primary consideration in determining the child's best interest is the goal of assuring stability and continuity. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317 [27 Cal.Rptr.2d 595, 867 P.2d 706].) When custody continues over a significant period, the child's need for continuity and stability assumes an increasingly important role. (*Ibid.*) That need often will dictate the conclusion that maintenance of the current arrangement would be in the best interests of that child. (*Ibid.*) Thus, one moving for a change of placement bears the burden of proof to show, by a preponderance of the evidence that there is new evidence or that there are changed circumstances that may mean a change of placement is in the best interest of the child. (*Ibid.*; see § 388; *In re Audrey D.* (1979) 100 Cal.App.3d 34, 45 [160 Cal.Rptr. 802].)

This is a difficult burden to meet in many cases, and particularly so when, as here, reunification services have been terminated or never ordered. After the termination of reunification services, a parent's interest in the care, custody and companionship of the child is no longer paramount. (*In re Stephanie M., supra,* 7 Cal.4th at p. 317.) Rather, at this point, the focus shifts to the needs of the child for permanency and stability. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309 [19 Cal.Rptr.2d 544, 851 P.2d 826].) In fact, there is a rebuttable presumption that continued foster care is in the best interest of the child (*id.* at p. 310); such presumption obviously applies with even greater strength when the permanent plan is adoption rather than foster care. A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, what is in the best interest of the child. (*In re Stephanie M., supra,* 7 Cal.4th at p. 317.)

Thus, in *In re Edward H.* (1996) 43 Cal.App.4th 584 [50 Cal.Rptr.2d 745], the denial of the parent's section 388 petition, made at the time of the section 366.26 hearing, and seeking to modify the order terminating reunification services, was upheld. The reviewing court noted that "At the point of these proceedings—on the eve of the section 366.26 permanency planning hearing—the children's interest in stability was the court's foremost concern and outweighed any interest in reunification. [Citation.]" (*Edward H.,* at p. 594.) The court concluded that the prospect of an additional six months of reunification to see if the mother would and could do what was required to regain custody would not have promoted stability for the children, and thus would not have promoted their best interests. (*Ibid.*)

■ In this case, the facts presented by the section 388 petition show that Mother is doing well, in the sense that she has remained sober, completed various classes, obtained employment, and visited regularly with

Angel. In addition, we shall assume, for the sake of this appeal, that this time her resolve *is* different, and that she will, in fact, be able to remain sober, remain employed, become self-supporting and obtain housing. Even so, such facts are not legally sufficient to require a hearing on her section 388 petition.

As noted above, there is a rebuttable presumption that, in the absence of continuing reunification services, stability in an existing placement is in the best interest of the child, particularly when such placement is leading to adoption by the long-term caretakers. (*In re Stephanie M., supra*, 7 Cal.4th at p. 317.) To rebut that presumption, a parent must make some factual showing that the best interests of the child would be served by modification.

Here, Mother has not made such a showing, and it is difficult to imagine how she could have done so, given the fact that Mother never actually parented Angel before her removal, and Angel was immediately placed with an adoptive family and her own sibling. Angel was removed from Mother's custody directly from the hospital, just two days after her birth. She was placed with a family that was not only in the process of adopting her older sibling, Robert, but that also was successfully parenting two biological children and two other adopted children (a sibling set), and that wanted to adopt Angel as well, in part because it valued providing its adopted children with biological siblings. The parents in this family clearly, by deed if not by name, were Angel's parents. They, not Mother, provided Angel with all the day-to-day, hour-by-hour care needed by a helpless infant and then growing toddler. Thus, although Mother's petition states that she has bonded with Angel, and that Angel is happy to see her and reaches for her on their visits, such visits, in total, add up to only a tiny fraction of the time Angel has spent with the foster parents. On this record, no reasonable trier of fact could conclude that the bond, if any, Angel feels toward Mother (as opposed to the bond that *Mother* feels toward Angel) is that of a child for a parent.

Perhaps if Angel were not adoptable and Mother was the only mother-figure in Angel's life, and Angel's only hope of having a family in the future, the result might be different. (See, e.g., *In re Jerome D.* (2000) 84 Cal.App.4th 1200, 1206-1207 [101 Cal.Rptr.2d 449] [child who was nearly nine years old had lived with mother for six and one-half years, expressed his wish to live with her again, had been having unsupervised overnight visits in her home, and seemed to be the "odd child out" in his stepfamily; thus, his relationship with his mother was beneficial and supported juvenile court's decision not to terminate his mother's parental rights even though child was adoptable].) But those are not the facts presented here. Accordingly, we conclude that the juvenile court did not abuse its discretion by denying the section 388 petition with no hearing.

*2. The Juvenile Court Did Not Err by Concluding That the Exception in Section 366.26, Subdivision (c)(1)(A) Did Not Apply*

■ Mother also contends that the juvenile court erred by refusing to find that her parental rights should not be terminated based on the exception to termination of such rights found in section 366.26, subdivision (c)(1)(A).

Section 366.26, subdivision (c)(1)(A), provides that if the juvenile court determines, by a clear and convincing standard, that it is likely a minor will be adopted, then it *shall* terminate parental rights and order the child placed for adoption *unless* the court finds a compelling reason for determining that termination would be detrimental to the child. One such reason is that the parent has maintained regular visitation and contact with the child *and* the child would benefit from continuing the relationship.

■ When contesting termination of parental rights under the statutory exception that the parent has maintained regular visitation with the child and the child will benefit from continuing the relationship, the parent has the burden of showing either that (1) continuation of the parent-child relationship will promote the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents (*In re Jamie R.* (2001) 90 Cal.App.4th 766, 773 [109 Cal.Rptr.2d 123]) or (2) termination of the parental relationship would be detrimental to the child. (*In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1252 [98 Cal.Rptr.2d 844].) Put another way, DCFS is *not* required to produce evidence demonstrating that a minor would *not* benefit from continued parental contact. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1333 [63 Cal.Rptr.2d 562].)

To overcome the preference for adoption and avoid termination of the natural parent's rights, the parent must show that severing the natural parent-child relationship would deprive the child of a *substantial*, positive emotional attachment such that the child would be *greatly* harmed. (*In re Lorenzo C., supra*, 54 Cal.App.4th. at p. 1342; *In re Casey D.* (1999) 70 Cal.App.4th 38, 50 [82 Cal.Rptr.2d 426].) A biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent. (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1348 [93 Cal.Rptr.2d 644].) A child who has been adjudged a dependent of the juvenile court should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may be beneficial to some degree, but that does not meet the child's need for a parent. (*Id.* at p. 1350.)

Thus, for example, evidence that (1) a child who was nearly nine years old had lived with his mother for six and one-half years and had expressed his wish to live with her again, (2) for at least two months the child had been having unsupervised overnight visits in her home, and (3) the child, who lived with stepsiblings, seemed to be the "odd child out" when his mother was allowed to visit him with his stepsiblings, was sufficient to show a beneficial parent/child relationship such as would justify maintaining the mother's parental rights *despite* clear and convincing evidence the boy was adoptable. (*In re Jerome D., supra,* 84 Cal.App.4th 1200, 1206-1207.) In other words, the relationship between the minor and his mother was one that promoted his well-being to such a degree that it outweighed the well-being the child would gain in a permanent home with new, adoptive parents. (*Ibid.*; cf. *In re Cliffton B.* (2000) 81 Cal.App.4th 415, 424-425 [96 Cal.Rptr.2d 778] [substantial evidence supported juvenile court's decision to terminate father's parental rights despite the exception of § 366.26, subd. (c)(1)(A); on one hand, the father had maintained a significant relationship with the child during monitored visitation, the child had lived with his father for a six-month period when he was three and one-half years old, the father had maintained his sobriety for seven months, and a social worker acknowledged that terminating the parental relationship would involve some risk to the child; on the other hand, the child had adjusted well to the foster family that was willing to adopt him, and there was a risk that the father, who had long history of drug abuse, would suffer relapse].)

 The factors to be considered when looking for whether a relationship is important and beneficial are: (1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the positive or negative effect of interaction between the parent and the child,[4] and (4) the child's particular needs. (*In re Jerome D., supra,* 84 Cal.App.4th at p. 1206.) While the exact nature of the kind of parent/child relationship which must exist to trigger the application of the statutory exception to terminating parental rights is not defined in the statute, the relationship must be such that the child would suffer detriment from its termination. (*In re Melvin A., supra,* 82 Cal.App.4th at p. 1253.)

 Here, applying these factors, we note that (1) Angel is very young, too young to understand the concept of a biological parent; (2) she has spent

---

[4]The positive and negative effect of interaction may be shown by such things as, despite regular visitation by the parent, the fact that a child repeatedly expresses that he or she does not want to visit the parent (*In re Lukas B.* (2000) 79 Cal.App.4th 1145, 1155 [94 Cal.Rptr.2d 693]), and unhappiness and acting out by the child related to parental visits. (*Ibid.*) Indifference to a parent, anger or detachment are also factors indicating the lack of the necessary positive relationship. (*In re Amanda D.* (1997) 55 Cal.App.4th 813, 822 [64 Cal.Rptr.2d 108].)

relatively few hours visiting with Mother, versus many hours being parented by the foster family; (3) Mother and Angel's interactions have been positive, but nothing in the record indicates that, from Angel's point of view, the interactions were particularly like those of a child with her mother; and (4) there is no evidence that Angel has any particular needs that can be met by Mother but not by the foster family.

In addition, to justify application of section 366.26, subdivision (c)(1)(A), any relationship between Mother and Angel must be sufficiently significant that *Angel* would suffer detriment from its termination. (*In re Melvin A., supra,* 82 Cal.App.4th at p. 1253.) Here, there was no hint in the record before the juvenile court that Angel would be harmed in any way if her relatively brief, albeit happy, visits with Mother were to end.

In contrast, if Mother's parental rights were *not* terminated, Angel would be denied a permanent, stable adoptive family with her own sibling, something that the Legislature *has* determined to be detrimental, as shown by its ranking of adoption as more desirable than long-term foster care or legal guardianship, and its streamlining of the dependency system to promote the prompt adoption of infants whose parents have failed to reunify with older siblings.

In a case factually similar to this one, the biological mother failed to establish that a sufficiently *significant* relationship existed between herself and her 16-month-old child such that termination of parental rights would be detrimental to the child. Although the mother acted lovingly and appropriately with her child during visits, the social worker indicated that the mother's relationship with the child was that of a "friendly visitor," that the child responded positively to anyone with whom she had some familiarity, and that the child's preference when she was tired, fussy, or needing reassurance was for her foster mother. (*In re Casey D., supra,* 70 Cal.App.4th at p. 52.)

In other words, for the exception to apply, the emotional attachment between the child and parent must be that of parent and child rather than one of being a friendly visitor or friendly nonparent relative, such as an aunt. (*In re Jason E.* (1997) 53 Cal.App.4th 1540, 1548 [62 Cal.Rptr.2d 416].) Here, while the evidence indicated that Mother, too, acts lovingly and appropriately with Angel during visits, Mother failed to present any evidence that Angel's relationship with Mother was so significant that its termination would cause her any detriment. Accordingly, the juvenile court did not err by refusing to find that the exception provided in section 366.26, subdivision (c)(1)(A) was applicable to these facts.

## DISPOSITION

The orders denying Mother's section 388 petition and terminating her parental rights are affirmed.

Kitching, J., and Aldrich, J., concurred.